## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

_____

KELLI ANNE BENTLEY,

                                        Plaintiff,

            v.                                                7:11-CV-1109
                                                             (GTS/ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

_____

LAWRENCE D. HASSELER, ESQ., for Plaintiff
SANDRA M. GROSSFELD, Special Asst. U.S. Attorney for Defendant

ANDREW T. BAXTER, U.S. Magistrate Judge

### REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable

Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## I.    PROCEDURAL HISTORY

On September 18, 2007, plaintiff filed an application for Disability Insurance

Benefits ("DIB"), alleging disability beginning May 1, 2000.[1] (Administrative

Transcript ("T.") at 147-50).  At the same time, plaintiff filed an application for

Supplemental Security Income ("SSI").[2] (T. 151-61).  Plaintiff's DIB application was

denied initially (T. 59-62), and plaintiff requested a hearing before an Administrative

_____

[1] Plaintiff later amended her onset date to November 5, 2004. (T. 639, 673; Pl.'s Br. at 1).

[2] Defense counsel states that the SSI application was "inadvertently" included in the transcript. (Def.'s Br. at 17) (citing T. 151-59).  One of the issues in this case is whether the ALJ erred in failing to consider an appeal from the denial of plaintiff's SSI application, which plaintiff argues would cover any disability onset after the expiration of plaintiff's insured status for DIB.

Law Judge ("ALJ").  Plaintiff[3] and her attorney appeared at a hearing before ALJ Elizabeth W. Koennecke on January 6, 2010. (T. 650-74).  ALJ Koennecke held a supplemental hearing on July 26, 2010, at which plaintiff's attorney[4] and Medical Expert ("ME"), Dr. Donald Goldman appeared and testified in reference to interrogatories that ALJ Koennecke sent to the ME. (T. 26-55).

In a decision dated August 19, 2012, the ALJ found that plaintiff was not disabled at any time from her amended onset date of November 5, 2004 until the expiration of her insured status on March 31, 2005.  (T. 7-25).  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on August 12, 2011.  (T. 1-6).

## II.   ISSUES IN CONTENTION

The plaintiff makes the following arguments:

(1)   The ALJ erred when she failed to find that plaintiff's depression and anxiety are "severe impairments." (Pl.'s Br. at 16-18).

(2)   The ALJ failed to properly evaluate plaintiff's credibility and disabling pain. (Pl.'s Br. at 18-22).

(3)   The ALJ erred in determining plaintiff's Residual Functional Capacity ("RFC"). (Pl.'s Br. at 22-23).

(4)   The ALJ erred in failing to consider plaintiff's appeal from the denial of SSI from March 31, 2005 to the present. (Pl.'s Br. at 24).

---

[3] Plaintiff appeared by video conference from Watertown, New York. (T. 650).

[4] Although the first page of the supplemental hearing transcript indicates that plaintiff appeared at the supplemental hearing (T. 28), it does not appear that plaintiff was present.  During the hearing, only the ME, plaintiff's attorney, and the ALJ spoke, and at one point, plaintiff's counsel stated that "[t]he claimant has been in North Carolina the last couple of months." (T. 53).

Defendant argues that the Commissioner's decision is supported by substantial evidence and should be affirmed.  For the following reasons, this court agrees with defendant and will recommend dismissal of the complaint.

## III.  APPLICABLE LAW

### A.  Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ."  42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an

3

impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner ] will consider him disabled without considering vocational factors such as age, education, and work experience . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.  The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step.  *Id.*

### B.     Scope of Review

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision.  *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision.  *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the

4

determination of whether there is substantial evidence in the record to support the decision.  42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)); *Williams*, 859 F.2d at 258.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258.  However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support of the ALJ's decision.  *Id.  See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

IV.  **RELEVANT APPLICATION**

The administrative record in this action contains a great many medical records, dating from 1998 until 2009, and includes interrogatory answers from the ME, who contacted by ALJ Koennecke in 2010. (T. 252-647).  Before the court considers plaintiff's first three claims, the court will consider her last argument because temporal scope of the relevant evidence depends on whether plaintiff is being considered for DIB or whether she is being considered for both DIB and SSI.

5

Plaintiff originally claimed disability as of 2000, however; her attorney amended plaintiff's onset date to November 5, 2004, when plaintiff claims that her pain increased significantly.  The most relevant medical records for purposes of the disability analysis, regardless of the type of application, now begin in November of 2004.

There is no dispute that for DIB purposes, plaintiff's insured date expired on March 31, 2005.  Thus, for purposes of DIB, plaintiff must prove that she was disabled prior to that date.  The ALJ and the ME considered the medical evidence up to March 31, 2005.  If the ALJ had also considered plaintiff's application for *SSI* on the merits, then the relevant medical records could have included all the records, even after March 31, 2005, and up to the time of the ALJ's decision on August 19, 2010.[5]

Plaintiff did file applications for both DIB and SSI, simultaneously on September 18, 2007.[6] (T. 148-50, 151-61).  As stated above, plaintiff's application for DIB was denied initially on December 12, 2007. (T. 59)  Plaintiff's counsel argues that both applications were denied, "and an appeal from the denial of the application of [SSI] benefits was or should have been filed by staff at the district office" because

---

[5] Plaintiff's counsel also submitted evidence to the Appeals Council.  However, that evidence was only a description of plaintiff's former work as a "Launderer," in conjunction with the argument that plaintiff could no longer perform her former occupation.  As defense counsel points out, the document does not state to what period of time it refers and states that it is "tentative." (T. 139-47).

[6] Defense counsel states that the SSI application was "inadvertently" included in this record. (Def.'s Br. at 17).  Defendant argues that none of the SSI issues should be before this court, and that plaintiff should not be able to "bootstrap" an SSI application into this pending action. (*Id.*)

plaintiff was unrepresented at the time.[7] (Pl.'s Br. at 24).  Counsel argues that the staff

at the Social Security Administration had a duty to "process [the SSI] appeal on her

behalf." (*Id.*)

Defense counsel has submitted the Declaration of Bryant Wilder, Deputy

Assistant Regional Commissioner of the Social Security Administration. (Wilder

Decl.; Dkt. No. 15 at 21-22).  Defendant has also attached to his brief, the actual

document, denying plaintiff's SSI application, dated September 25, 2007, and sent to

the same address to which the DIB denial was sent in December of 2007. (*Compare*

Def.'s Ex. 1 *with* (T. 59)).  It is clear from defendant's exhibit that there was a denial,

and that the decision was based upon plaintiff's ineligibility for SSI due to her excess

income. (*Id.*)

The notice made it clear that she was being denied eligibility due to her

husband's income, and that if she wished to challenge that finding, she had sixty (60)

---

[7] At the same time, plaintiff's counsel argues that "[t]here is no copy of the denial of
plaintiff's [SSI] benefits in the Record.  Accordingly, the ALJ's statement regarding the denial is only
reasonable speculation." (T. 24).  This statement could imply that there was no denial.  It is unclear
what plaintiff's counsel is attempting to argue by this statement, but the court would point out that if
there had been no denial, the SSI application would not have been before the ALJ or this court.  It is
well-settled that the district court may not review an adverse decision of the Commissioner regarding
the plaintiff's entitlement to SSI except as expressly authorized by the Social Security Act, 42 U.S.C.
§ 1383(c)(3) (incorporating section 405(g)).  Section 405(g) of the Social Security Act requires that
plaintiff exhaust her administrative remedies, and that an appeal to federal court must be from a "final
decision" of the Commissioner. 42 U.S.C. § 405(g). *See Heckler v. Ringer*, 466 U.S. 602, 617
(1984)); *Blanchard v. Social Security Administration*, CV-91-1576, 1993 WL 72353, at *1-3
(E.D.N.Y. March 1, 1993).  The statute also provides that there shall be no review other than that
provided in section 405(g). 42 U.S.C. § 405(h).  An exception to the exhaustion requirement does
exist, however, if the Commissioner's decision is challenged on constitutional grounds, or exhaustion
is waived for various reasons, not applicable to, or argued in, this case. *Califano v. Sanders*, 430 U.S.
99, 109 (1977) (constitutional challenges); *Pavano v. Shalala*, 95 F.3d 147, 150 (2d Cir. 1996)
(waiver).  Any such argument would be moot because defendant has submitted a copy of the denial
that was sent to plaintiff's home.

days to ask for reconsideration.[8] (*Id.* at 26).  The notice also stated that the decision

applied *only* to the SSI claim, and that any decision regarding other benefits would be

sent "in a separate letter." (*Id.* at 25).  Deputy Commissioner Wilder states that a

review of plaintiff's records indicates that she did not file a request for reconsideration

of the SSI denial. (Wilder Decl. ¶ 5).  Plaintiff obviously received the DIB denial,

because she properly appealed throughout the administrative process.  During the

supplemental hearing held on July 26, 2010, the ALJ specifically stated that the only

application that was before her was the DIB application, and that plaintiff's insured

status expired on March 31, 2005. (T. 28, 31).

Plaintiff does *not* argue that she met the income requirements when she applied

for SSI in 2007.  Instead, at the July 26, 2010 supplemental hearing, her counsel

admitted that he had not focused on the SSI application because he did not believe that

plaintiff met the income requirements due to her family situation, but that he "spoke

with her *this morning*,[9] and found out that she and her husband have been separated

*for a couple of months*, so the SSI part may, very well be relevant." (T. 31) (emphasis

added).  It would appear from counsel's statement that plaintiff *may* have become

eligible for SSI sometime in the middle of 2010.  Counsel may be arguing that

plaintiff's 2007 SSI application should have still been in effect, and that once plaintiff

---

[8] The notice also states that the 60 days starts to run the day after the claimant gets the letter, and that the agency assumes receipt of the letter five days after the date on the letter itself, "unless you show us that you did not get it within the 5-day period." (Dkt. No. 15 at 26).  Plaintiff was also sent a "Fact Sheet on SSI Federal Living Arrangement Categories." (Dkt. No. 15 at 28-32).

[9] "This morning" refers to July 26, 2010.

met the income requirements, her SSI application should be considered.

The regulations provide that if the claimant files an application for SSI benefits "before the first month you meet all the other requirements for eligibility, the application will remain in effect from the date it is filed until we make a final determination on your application, unless there is a hearing decision on your application." 20 C.F.R. § 416.330. The regulation also provides that if the claimant meets all the requirements for eligibility "while [the] application is in effect," then the earliest month that SSI benefits will be paid is "the month following the month that you meet all the requirements." *Id.* § 416.330(a). However, if the claimant does not meet all the requirements for eligibility until after the period for which the application was in effect, "you must file a new application for benefits." *Id.* § 416.330(b).

In this case, plaintiff filed her SSI application in September of 2007. The denial is dated September 25, 2007, and the agency assumes receipt five days later on September 30, 2007. Plaintiff had sixty days to appeal the denial of eligibility. When she did not appeal, the decision became final, and her SSI application was no longer "in effect." If plaintiff did not become financially eligible for SSI until 2010, when she was separated from her husband,[10] according to the regulations, she would have had to file a new SSI application at that time. Even if she had appealed within the sixty days of the denial of her original SSI application in September 2007, the result would presumably have been the same, because her financial status had not changed at

---

[10] It is unclear that the separation itself would have automatically rendered her financially eligible for SSI in any event. Certainly, the ALJ in this case would not have been able to make that determination.

that time.

Finally, plaintiff implies that, because plaintiff was unrepresented, the Commissioner had a "duty" to help plaintiff appeal. (Pl.'s Br. at 24). Plaintiff mistakes the "duty" that an ALJ has to develop the record at a hearing, with a "duty" to help plaintiff appeal from an adverse determination. The former is a requirement under the law. *See Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (ALJ has an affirmative duty, even if the claimant is represented by counsel, to develop the medical record, if it is incomplete); 20 C.F.R. § 416.912(d) ("We will make every reasonable effort to help you get medical reports from your own medical sources when you give us permission to request the reports."). However, this duty does not extend to the staff of Social Security making sure that plaintiff files a timely appeal from an adverse decision. The notice of denial specifically states that plaintiff has sixty days to appeal, and provides for an extension of time with a showing of good cause. (Defs. Ex. 1 at 3). The notice advises plaintiff of all the procedures she must follow to appeal, provides the form number of the appeal and the name of the form, and states: "To get this form, contact one of our offices. We can help you fill out the form." (*Id.*) While the notice states that the Commissioner's staff will help the claimant compete the form, there is no duty that the staff ensure that plaintiff perfects the appeal in a timely manner. Thus, plaintiff's argument that the ALJ erroneously failed to consider plaintiff's application and/or appeal for SSI cannot succeed.

## V.   <u>FACTS</u>

Having decided that the relevant time period to consider plaintiff's alleged

10

disability is between November 5, 2004 until March 31, 2005, the court will focus on the relevant evidence relating to that time period.[11]  Plaintiff claims disability as a result of scoliosis. depression, and anxiety.  Due to plaintiff's scoliosis, she had a Harrington Rod inserted into her spine when she was 16 years old. (T. 302).  The spinal surgery had to be repeated a year later. (*Id.*)  Plaintiff testified at the January 2010 hearing that after the second surgery, she was able to function "pretty well," and that she worked as a teenager, got married, and had children. (T. 655).

The medical records covering the relevant time period are from Family Practice Associates, including records signed by plaintiff's treating general practitioner, Dr. Timothy W. Moon, DO.[12] (T. 396-436).  These records also include the MRIs of the spine, both lumbar and thoracic, that were done in November of 2004, when plaintiff now alleges that her disability began. (T. 396-99).  The court will cite to the relevant records and the facts included in those records in conjunction with the analysis below.

## VII.  THE ALJ'S DECISION

At Step Two of the disability analysis, the ALJ found that from November 5, 2004 through March 31, 2005, plaintiff's only "severe" impairment was her scoliosis.

---

[11] The ME was initially told that the relevant time period began in 2000, so he included the prior records in his consideration.  When the supplemental hearing began, the issue was still the period between 2000 and 2005. (T. 28).  The ALJ asked Dr. Goldman if his opinion applied to the "larger" period, beginning in 2000. (T. 28, 48).  However, plaintiff's counsel's questioning at the supplemental hearing focused on the time period after November 5, 2004. (*See e.g.,* T. 35, 38, 41, 43, 51).

[12] Dr. Moon is a doctor of osteopathy (DO).  The court notes that osteopaths are considered "licensed physicians" and are, therefore, acceptable medical sources under the regulations. 20 C.F.R. § 404.1513(a)(1).

(T. 13).  The ALJ acknowledged that plaintiff also claimed anxiety and depression, but found that neither of those two mental impairments were "severe" because they "did not cause more than minimal limitation on the claimant's ability to perform basic work activities." (T. 13-14).  In making this determination, the ALJ extensively considered these alleged impairments in conjunction with the appropriate listed impairments and utilized the Psychiatric Review Form. (T. 16).  Because plaintiff did have at least one severe impairment, the ALJ proceeded to Step Three and found that plaintiff's scoliosis was not severe enough to meet the requirements of a Listed Impairment. (T. 16).  The ALJ then determined at Step Four, that plaintiff had the RFC to lift and carry between 15 and 20 pounds, frequently; lift/carry between 20 and 25 pounds, occasionally; walk or stand for between four and six hours; sit for eight hours; continuously reach, handle, finger, feel, and push/pull with either hand; and continuously operate foot controls with either foot. (T. 16).  The ALJ also found that plaintiff should avoid repetitive bending or twisting; and climbing stairs and ramps. (*Id.*).  Plaintiff could occasionally kneel, but could never climb ladders or scaffolds, stoop, crawl, or crouch. (*Id.*)

In making this determination, the ALJ considered plaintiff's credibility, together with the relevant medical records and the testimony of the ME, who testified in response to interrogatories submitted by the ALJ. (T. 17-18).  The ALJ placed great weight on the ME's testimony. (T. 18).  In particular, the ALJ cited the ME's testimony stating that "there was no objective medical evidence prior to March 31, 2005 that would support a change in the claimant's condition; there was only the

12

subjective report by the claimant that her condition had deteriorated." (T. 18).  The ALJ found that the ME's opinion was consistent with the medical evidence, and that there was no "rebutting opinion for the remote period at issue." (*Id.*)  The ALJ rejected the plaintiff's subjective complaints of pain and credibility to the extent that they were inconsistent with her RFC finding and the opinion of the ME. (*Id.*)  The ALJ found that during the period at issue, plaintiff engaged in a wide range of activities, including caring for four of her own children and a foster child, driving, and washing dishes.  The ALJ also noted that on many occasions during the relevant time period, plaintiff's doctor noted that plaintiff was independent in "all" her activities of daily living. (*Id.*)  Finally, the ALJ stated that no other acceptable medical source put any functional limitations on plaintiff prior to the expiration of her insured date. (*Id.*)

Based on the RFC, as determined by the ALJ, she also found that plaintiff could perform her previous work as a launderer.[13] (T. 19).  The ALJ found that plaintiff's description of her former work as a launderer did not involve the performance of work activities that were outside the ALJ's description of her RFC. (T. 19).  In her decision, the ALJ compared the plaintiff's RFC, with the physical and mental demands of her former position and found her former position would not require plaintiff to perform more than light work. (*Id.*)  The ALJ found that plaintiff's non-exertional impairments, including her inability to bend twist, climb, stoop, crawl, or crouch would not interfere with her ability to perform her former occupation because "her past relevant work as a

---

[13] The job was actually a "senior launderer."  Plaintiff worked at a correctional facility and supervised approximately 50 employees in the laundry. (T. 188-89).

launderer did not require her to stoop, climb, crouch or crawl and crouch, and only required her to kneel for 30 minutes each day." (*Id.*)  The ALJ found that plaintiff was able to perform the job "as actually . . . performed by the claimant." (*Id.*)

Because the ALJ found that plaintiff could perform her prior occupation at Step Four of the disability analysis, the ALJ did not proceed to Step Five to consider whether there were "other" jobs in the national economy that plaintiff could do.  The ALJ found that plaintiff was not disabled prior to the expiration of her insured status on March 31, 2005. (T. 20).

## VIII.  DISCUSSION

### A.     Severe Impairments

#### 1.     Legal Standards

The claimant bears the burden of presenting evidence establishing severity at Step 2 of the disability analysis. *Briggs v. Astrue*, No. 5:09–CV–1422 (FJS/VEB), 2011 WL 2669476, at *3 (N.D.N.Y. Mar. 4, 2011) (Report-Recommendation), *adopted*, 2011 WL 2669463 (N.D.N.Y. July 7, 2011).  A  severe impairment is one that significantly limits the plaintiff's physical and/or mental ability to do basic work activities.  *See* 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. § 404.1521(a) (noting that an impairment is not severe at Step Two if it does not significantly limit a claimant's ability to do basic work activities).  The Regulations define "basic work activities" as the "abilities and aptitudes necessary to do most jobs," examples of which include, (1) physical functions such as walking, standing, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3)

understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers and usual work situations; and (6) dealing with changes in a routine work setting.  20 C.F.R. § 404. 1521(b).  It is quite clear from these regulations that "severity" is determined by the limitations imposed by an impairment, and not merely its by diagnosis.  The "presence of an impairment is . . . not in and of itself disabling within the meaning of the Act." *Coleman v. Shalala*, 895 F.Supp. 50, 53 (S.D.N.Y. 1995) (citations omitted).

An ALJ should make a finding of " 'not severe' . . . if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.' "  *Rosario v. Apfel*, No. 97 CV 5759, 1999 WL 294727, at *5 (E.D.N.Y. Mar. 19, 1999) (quoting Social Security Ruling ("SSR") 85-28, 1985 WL 56856, at *3).  The Second Circuit has held that the Step Two analysis "may do no more than screen out *de minimis* claims."  *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995).  If the disability claim rises above a *de minimis* level, then the remaining analysis of the claim at Steps Three through Five must be undertaken.  *Id.* at 1030.

Often when there are multiple impairments as in this case, and the ALJ finds some, but not all of them severe, an error in the severity analysis at Step Two may be harmless because the ALJ has continued with sequential analysis and did not deny the claim based on the second step alone.  *Tryon v. Astrue*, No. 5:10-CV-537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (citing *Kemp v. Commissioner of Soc. Sec.*, No. 7:10-CV-1244, 2011 WL 3876526, at *8 (N.D.N.Y. Aug. 11, 2011)).  This is

particularly true because the regulations provide that combined effects of all impairments must be considered, regardless of whether any impairment, if considered separately, would be of sufficient severity.  20 C.F.R. §§ 404.1523, 416.923; *Dixon*, 54 F.3d at 1031.

### 2.   Application

In this case, although the ALJ found that plaintiff's scoliosis was severe, the ALJ found that plaintiff's anxiety and depression were not "severe" within the meaning of the statute. (T. 14).  The ALJ's determination is supported by substantial evidence in the record.  Plaintiff appeared at Family Practice Associates for her initial visit on July 30, 2003. (T. 401-402).  At that time, the only problem expressed by plaintiff was back pain. (*Id.*)  The first time that either depression or anxiety was mentioned was on December 19, 2003, when a Licenced Practical Nurse (LPN) noted that plaintiff was complaining of depression, and that she was "tearful" when she spoke. (T. 403).  Anxiety and depression "questionnaires" were administered, and the report states that the questionnaires "reveal[ed] moderate to marked depression and minimal to moderate anxiety." (T. 404).  A Physician's Assistant signed the report. (*Id.*)  Under the regulations, a physician's assistant is not an acceptable medical source that "establish" a "medically determinable impairment." 20 C.F.R. § 404.1513(d).

After the December 19, 2003 report, anxiety is only mentioned one more time during the relevant time period, up to and including March 31, 2005.  On June 4, 2004, the report states that plaintiff has "Anxiety State Unspecified," but does not mention depression. (T. 406).  At the same time, however, plaintiff was asking the

doctor for a "note stating that she is capable of being a foster parent." (T. 405).  The report states that the plaintiff displayed "comfort and cooperation during the encounter," she interacted appropriately, she was attentive, and was able to concentrate. (T. 406).  The Zoloft that she was prescribed earlier was discontinued. Her prescription for Ambien was continued to help her sleep. (*Id.*)

No mental disorder was mentioned by Dr. Moon in his July 1, 2004, August 4, 2004, or his September 10, 2004 assessments. (T. 409, 411, 414).  On August 4, 2004, Dr. Moon prescribed Elavil. (T. 410).  Although Elavil is used for symptoms of depression,[14] Dr. Moon stated that he was prescribing Elavil "for chronic pain." (T. 410).  On October 11, 2004, Dr. Moon stated that plaintiff was having "some depressive symptoms, and that she had these symptoms in the past. (T. 415).  Dr. Moon stated that plaintiff had taken Prozac in the past, he was going to start her on that medication again, and that the Prozac might also help the back pain. (T. 415). The diagnosis of plaintiff's mental disorder is described as "Depressive Dis Recurrent Mild Major." (T. 416).  This diagnosis continues throughout the relevant time period and beyond.[15] (*See e.g.,* T. 419, 421, 423, 425, 427, 430, 432).

There is absolutely no indication from any of the relevant medical records that plaintiff's mental disorder places more than mild restrictions on plaintiff's activities.

---

[14] http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000666/.

[15] The dates of Dr. Moon's reports are November 5, November 10, November 16, and December 17, 2004. (T. 418, 420, 422, 424).  In 2005, Dr. Moon's reports prior to the expiration of plaintiff's insured status are dated February 11 and March 9, 2005. (T. 426, 429).  The diagnosis of Depressive Disorder Recurrent Mild Major is continued into 2005. (*See e.g.,* T. 431-32 –  May 11, 2005; T. 433-34 – June 8, 2005).

According to the DSM4-TR, Diagnostic and Statistical Manual of Mental Disorders, there are various categories of Recurrent Major Depressive Disorder. AMERICAN PSYCHIATRIC ASSN., DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 376, 412 (4th Ed. Text Revision 2000) (DSM-IV-TR).  When the "Major Depressive Disorder" is recurrent, but "mild," there are "[f]ew if any symptoms in excess of those required to make the diagnosis and symptoms result in only minor impairment in occupational functioning or in usual social activities or relationships with others." *Id.* at 413.

In her decision, the ALJ examined these "mild" restrictions in conjunction with the appropriate psychiatric review technique required by the regulations.  The ALJ first compared plaintiff's depression with the criteria found in Listings 12.02 – 12.04, 12.06 – 12.08, and 12.10.[16]  The ALJ found that because plaintiff's mental impairment did not cause at least two "marked" limitations, or one "marked" limitation and repeated episodes of "decompensation," plaintiff's impairments did not meet the required severity. (T. 15).  With respect to the anxiety-related disorders, a listed impairment would require plaintiff to demonstrate a "complete inability to function independently outside the home. *See* 20 C.F.R. Pt. 404, Subpt. P, App.1 § 12.06(c).

In this case, plaintiff clearly did not meet the listed impairment requirements, so

---

[16] The court notes that only Listings 12.04 (Affective Disorders, including Depression) and 12.06 (Anxiety Related Disorders) are actually relevant to plaintiff's claims, but the ALJ also reviewed the other listed impairments. (T. 15).  Plaintiff does not argue that she meets a listed impairment, only that her mental impairments were "severe."  However, before finding that plaintiff's mental impairments only placed mild, if any, restrictions on her daily activities, the ALJ was required to, and did, analyze the impairments in accordance with the regulations.

the ALJ examined the degree of limitation, if any, that these mental impairments placed on plaintiff's activities.  The ALJ stated that she placed "some weight" to the Psychiatric Technique Review Form that was prepared by a State Agency Review Psychologist, who on December 7, 2007, determined that there was insufficient evidence to establish whether the plaintiff even had a medically determinable mental impairment prior to March 31, 2005. (T. 16, 499).  As stated above, there is absolutely no medical evidence indicating that, even assuming plaintiff had episodes of depression and/or anxiety during the relevant time period, these episodes placed any more than minimal restrictions on her daily activities, and whatever problems she may have had, were ameliorated by the medications that were prescribed for her.

Plaintiff complained about depression and anxiety in December of 2003, but by June of 2004, she was requesting a note stating that she was capable of being a foster parent. (T. 403, 405).  In July of 2004, Dr. Moon commented that plaintiff was able to take care of four children plus a foster child, ranging in age from 2 to early adolescence. (T. 407).  In the same report, Dr. Moon stated that plaintiff was "very active." (*Id.*)  Although these reports are dated prior to the time that plaintiff now claims she became disabled, her alleged mental impairments began during this time. In October of 2004, Dr. Moon noted that plaintiff had "some" depressive symptoms, but that the medication seemed to help. (T. 415).  In November of 2004, plaintiff requested an increase in the Prozac prescription, but Dr. Moon did not note any exacerbation of mental symptoms in his report. (T. 418-19).  In fact, Dr. Moon noted that "[s]he is also taking the Prozac and is feeling much better with that." (T. 418).  Dr.

Moon increased the dosage "to give her better coverage." (*Id.*)

The worst day that plaintiff had was on November 10, 2004, where she complained of an increase in pain and came to her doctor's appointment "tearful" and walking with a cane, however, there was no discussion of plaintiff's mental status, other than to repeat the diagnosis.[17] (T. 420-21).  Dr. Moon prescribed some Valium. (T. 421).  By November 16, 2004, plaintiff was "feel[ing] a little better." (T. 422). The rest of the reports up to May of 2005 mention the diagnosis of depression and the medications that plaintiff was taking, but did not note any increase in depressive symptoms or restrictions in her daily activities based on any mental impairment.  The ALJ's determination that plaintiff's mental impairments were not severe is supported by substantial evidence in the record.

Even if the ALJ did not consider plaintiff's mental impairments severe, the ALJ found that plaintiff's scoliosis was severe and continued with the disability analysis. The ALJ did not deny plaintiff's benefits because her impairments were not severe, and it is also clear the ALJ extensively considered the effects of plaintiff's alleged depression and anxiety in conjunction with the scoliosis, the impairment that she did find was "severe." Thus, even if the ALJ had erred in her severity determination, a finding this court does not make, any such error would have been harmless because the ALJ continued to consider plaintiff's disability at steps 3 and 4 due to her severe

---

[17] On November 16, 2004, Dr. Moon noted that plaintiff went to the emergency room on November 12, but she was not admitted to the hospital. (T. 422).  It appears that the emergency room visit was because of some abdominal issues that she was having, and not because of her back or her mental impairments. (*Id.*)

physical impairment.

### B.    Pain/Credibility

#### 1.    Legal Standards

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999) (quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. § 404.1529; *see also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged. . . ."  20 C.F.R. § 404.1529(a).  Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* § 404.1529(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the

credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* § 404.1529(c)(3).

## 2. Application

In this case, the ALJ followed the regulations for the analysis of plaintiff's pain. (T. 17-18). It is undisputed that plaintiff has scoliosis, has had two surgeries on her back and suffers a degree of pain based on this condition. While the condition may be deteriorating, the ALJ determined that plaintiff's condition did not result in disabling pain prior to the expiration of plaintiff's insured status on March 31, 2005. The ALJ noted that the degree of plaintiff's pain was not as severe as she claimed. (T. 18). In his brief, plaintiff's counsel discusses plaintiff's pain in 2007; however, the relevant time period ended in March of 2005. Counsel states that by 2007, plaintiff's driving was limited to taking her son to school and going to her doctor's appointments. (Pl.'s Br. at 21). Counsel also states that plaintiff testified that between 2000 – 2005, she had a hard time sitting or standing for long, and she would need to lay with pillows under her to "deal with everyday life." (*Id.*) Counsel also claimed that "some of her medications made her drowsy and unable to drive." (*Id.*; *See* T. 671).

22

Plaintiff's testimony and counsel's arguments are not consistent with the medical evidence and plaintiff's own contemporaneous statements to Dr. Moon during 2005.  On February 11, 2005, Dr. Moon stated that plaintiff "*denies any difficulty with her driving*" and "denies *any* somnolence while she is taking the medication," even though she was taking Vicodin "4 times daily." (T. 426) (emphasis added).  Although plaintiff testified that her whole family helped with everything, she told Dr. Moon in 2004 and 2005 that she was "[i]ndependent in all ADL's." (T. 426, 672).  The court also notes that when plaintiff was testifying, it appears as if she were discussing her condition at the time of the hearing in 2010, even though the ALJ reminded her that she was supposed to be testifying about 2004-05.  (*See* T. 672 ("even to get out of bed I need help, at least a few times, probably three or four times a week, . . .  because of the problems with my hips, with my spine . . . [a]nd has got progressively worse, where I need help even putting my legs over the bed to get onto the floor.")).  A review of the medical records during the relevant time period shows no such complaints or limitations.[18]

On November 10, 2004, she had been having more pain for four days prior to her appointment with Dr. Moon, but the doctor noted that she was independent in all ADLs. (T. 420).  On November 16, 2004, plaintiff was doing better, and although there was mild focal lumbar spinous process tenderness, there was no "step off," no instability, her strength was 5/5, she had firm musculature, and no spasms. (T. 423).

---

[18] In July of 2004, even though plaintiff complained of back pain, back stiffness, deformities, joint pain and limitation of movement, she denied poor balance, muscle pain, numbness, paralysis, paresthesia, trouble walking, and weakness. (T. 408).

On December 17, 2004, Dr. Moon stated that when plaintiff was taking her pain medication, "she was able to participate in most ADLs with no complaints."[19] (T. 424). On February 11, 2005, although there was palpable periarticular soft tissue tenderness, there were no palpable fluids, her muscle strength was within normal limits, and straight leg raising test was negative. (T. 427).  The ALJ did not doubt that plaintiff was in pain, she only found that the degree of plaintiff's pain was inconsistent with her own contemporaneous statements and the medical records.

Plaintiff's counsel conceded that there was insufficient evidence to show that plaintiff met the requirements for disability prior to November 5, 2004, but the ME also testified that plaintiff's 2004 MRI report was not significantly worse that the tests that she had in 2002,[20] and the ME testified that he did not understand why plaintiff's condition changed for the worse in 2004. (T. 37, 43).  The ME also states that if the fusion of the rods was good, it did not explain "why someone would have a great deal of pain . . . ." (T. 46).  The ME stated that if one of plaintiff's doctors had stated that the rod might be broken in 2001, but nothing is done until years later, "it couldn't have been too bad." (T. 46).

The ME also stated that from an orthopedic point of view, deterioration would have to be "neurologically or bone substance, . . . unfortunately, not just . . . the patient

---

[19] "ADLs" refer to Activities of Daily Living.

[20] In his November 10, 2004 report, Dr. Moon specifically stated that he was "not experienced with reading MRIs, but he did not see any gross significant spinal cord compression. (T. 420).  The ME also pointed out that the MRI could have been distorted by the metal rods in plaintiff's back. (T. 33, 35).

telling you its getting worse." (T. 38).  The ME stated that in order to find that plaintiff's condition had gotten worse, he would have had to see "positive straight leg, . . . range of motion now as opposed to what it was three months ago, are there any deep tendon reflex changes, is there any atrophy, can she walk?" (T. 39).  The ME did not find any of these signs of a worsening condition.  He stated that "we don't have good examinations." (T. 44).  The ME then discussed plaintiff's RFC, as the court will discuss below.  Based upon the records, plaintiff's own contemporaneous statements about what she was able to do during the relevant time period, and the ME's testimony, the ALJ's rejection of the degree of plaintiff's pain is supported by substantial evidence in the record.

> **C.  Residual Functional Capacity (RFC)/Past Relevant Work**
>
> > **1.  Legal Standards**
> >
> > > **a.  RFC**

In rendering a residual functional capacity (RFC) determination, the ALJ must consider objective medical facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R §§ 404.1545, 416.945. *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  An ALJ must specify the functions plaintiff is capable of performing, and *may not simply make conclusory statements regarding a plaintiff's capacities*. *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183; *Sullivan v. Secretary of HHS*, 666 F.

Supp. 456, 460 (W.D.N.Y. 1987)).  RFC can only be established when there is substantial evidence of each physical requirement listed in the regulations. *Id.*  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Trail v. Astrue*, 5:09-CV-1120, 2010 WL 3825629 at *6 (N.D.N.Y. Aug. 17, 2010) (citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *7).

### b.      Past Relevant Work

Once the ALJ determines plaintiff's RFC, the ALJ must then determine at Step 4 of the disability determination, whether plaintiff can perform her past relevant work. The ALJ compares plaintiff's RFC with the duties of the specific job as plaintiff previously performed it and the functions and duties of the job as it is performed in the national economy. *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003) (citing *Jock v. Harris*, 651 F.2d 133, 135 (2d cir. 1981); SSR 82-62, 1982 WL 31386 (SSA 1982)). Plaintiff carries the burden to show that she cannot perform either job. *Id.*  The Second Circuit noted that many specific jobs differ from those jobs as they are generally performed, and a vocational expert may identify those unique aspects without contradicting the Dictionary of Occupational Titles ("DOT"). *Id.*  In this case, no vocational expert was called, and plaintiff's counsel argues that the ALJ did not properly determine the RFC required for either plaintiff's specific job or the job as it is performed in the national economy.

### 2.      Application

### a.      RFC

Plaintiff argues that the ALJ's determination of plaintiff's RFC is not supported by substantial evidence.  More importantly, the plaintiff argues that because the RFC evaluation is not supported by substantial evidence, the ALJ incorrectly found that plaintiff could perform her prior work as a senior launderer/laundry supervisor. (Pl.'s Br. at 23).  Counsel argues that instead of asking plaintiff about the physical demands of her prior work at the January 2010 hearing, the ALJ used an old form that plaintiff completed for the record that did not accurately reflect the physical requirements of plaintiff's job, and that the ALJ should have called a VE to testify. (*Id.*)

With respect to plaintiff's RFC, the court notes that there were no physical RFC evaluations in the record from any treating physician.[21]  The ME testified to the physical restrictions to which he believed plaintiff would have been subjected for the period between 2004 and March 31, 2005. (T. 47-52).  He testified based upon the answer to an interrogatory that ALJ Koennecke sent him, after reviewing plaintiff's medical records from May of 2000 until March 31, 2005.[22] (T. 628-36).  Dr. Goldman submitted a "report" that was handwritten on the interrogatory form and an RFC analysis, dated February 6, 2010. (*Id.*)

Plaintiff's counsel then contacted the ALJ and indicated that he would be changing plaintiff's alleged onset date to November 5, 2004. (T. 638-39).  As a result

---

[21] On December 10, 2007, a non-examining disability analyst completed an RFC evaluation. (T. 515-20).  The ALJ did not use that evaluation in her determination.

[22] Plaintiff originally claimed disability beginning in 2000.  Therefore, the ALJ sent Dr. Goldman (the ME) plaintiff's medical records beginning in 2000.  The relevant time period, as stated above is now November of 2004 until March 31, 2005.

of counsel's letter, the ALJ re-contacted Dr. Goldman, and the ME submitted an

updated report and RFC evaluation, dated June 9, 2010. (T. 640-47).  Dr. Goldman

testified that between 2004 and up until March of 2005, plaintiff had the ability to

frequently lift 15 to 20 pounds and occasionally lift 20 to 25 pounds.[23] (T. 47, 630).

He also testified that plaintiff could walk 4 to 6 hours in an 8-hour day and could sit

for 6 to 8 hours in an 8-hour day. (T. 48).  Dr. Goldman stated that plaintiff would not

be able to engage in repetitive bending and could not twist, stoop, crawl, or climb

ladders or scaffolds. (T. 47, 630).  Dr. Goldman stated that these restrictions were

based upon the objective medical evidence of record. (T. 48).  Counsel then asked Dr.

Goldman if he could articulate a "more restrictive opinion from the fall 2004 to March

30, [sic] 2005?" (T. 51).  Dr. Goldman responded that "I could if I had some

information, which is not in the record." (*Id.*)  Dr. Goldman pointed out that there was

no evidence of atrophy or weakness, problems with gait, abnormality, range of motion

. . . that kind of stuff." (T. 51).  The ALJ kept the record open for another two weeks to

allow plaintiff to submit any further evidence, with the understanding that the issue

was a closed period of time that ended in March of 2005, and acknowledging that any

opinion would still have to be based on "old records."[24] (T. 53-54).  No further

---

[23] The court notes that Dr. Goldman's estimate of how much weight plaintiff could lift was different in his handwritten notes than indicated on the form where he had checked boxes that reflected physical limitations. (T. 630, 631, 642).  In the form, Dr. Goldman checked boxes indicating that plaintiff could lift 11-20 pounds frequently, and could lift 21-50 pounds occasionally. (T. 631, 642).  Counsel pointed out the inconsistency at the supplemental hearing (T. 48-49), and, Dr. Goldman testified that the handwritten restrictions "overrules these checkmarks." (T. 50).

[24] At the first hearing, the ALJ noted that "Dr. Moon is no longer there." (T. 673).  Plaintiff's counsel speculated that Dr. Moon may have had something to do with the military. (T. 674).  The

medical evidence was submitted.

Because there was no other evidence of plaintiff's physical restrictions, the ALJ was entitled to rely upon Dr. Goldman's opinion of plaintiff's RFC, and the ALJ's RFC finding is supported by substantial evidence.

### b.    Past Relevant Work

The issue ultimately turns on whether the RFC stated by Dr. Goldman, and as found by the ALJ, would allow plaintiff to perform her old job as a laundry supervisor. Plaintiff argues that it would not.  Plaintiff's counsel argues that because the ALJ accepted Dr. Goldman's findings that plaintiff could not perform any repetitive bending, no twisting, and no stooping, the ALJ should have "made a finding of disability based on SSR 85-15 and SSR93-9p." (Pl.'s Br. at 23).  Counsel further argues that the ALJ should not have relied upon plaintiff's assessment of her former work that she completed at the time of her DIB and SSI applications, but should have questioned her further about the physical requirements of her prior job. (T. 188-89). Counsel bases this argument on the fact that Dr. Goldman opined that plaintiff could not stoop at all.  Although plaintiff stated in her written evaluation of the laundry supervisor position that stooping was "0" total hours (T. 188), "[c]ounsel respectfully

---

ALJ noted that none of plaintiff's "current providers" were willing to discuss the issue of her ability to work prior to March 31, 2005.  In a letter to the ALJ, dated August 3, 2010, plaintiff's counsel stated that Dr. Moon left the Watertown area, and although counsel was able to contact him, Dr. Moon refused to complete an RFC for because he had not seen the plaintiff in several years. (T. 250). At the hearing, the ALJ asked plaintiff's counsel if there was anything with regard to plaintiff's functional capacity prior to her last insured date, and counsel stated that there was no contemporaneous evidence. (T. 674).  At the end of the first hearing, the ALJ stated that there was "just not enough here," and that was why she contacted Dr. Goldman. (T. 674).

submits that an individual may reasonably answer "0" to that question even when there [sic] job requires occasional stooping." (Pl.'s Br. at 23).  While that argument could be valid in some circumstances, it is clear that plaintiff *in this case* understood the concept of indicating a function that she performed for less than one hour when she wrote that she would only have to "kneel . . . 0.5 [total hours]." (T. 188).  Thus, it is apparent that "0" actually meant that plaintiff did not have to stoop at her previous job.

The plaintiff described the job as one involving "supervising, counting laundry, [making] sure machines were in working order, [inventorying] supplies, [and doing] daily paperwork to be sure accounts reconciled." (T. 188).  She indicated that she carried sheets daily, and laundry bags if necessary, but the inmates helped with the lifting and carrying . . . since everyone knew I had back problems . . . ." (T. 188).  She supervised fifty people and spent 80% of her time doing so. (T. 189).  She stated that the heaviest weight that she lifted was 10 pounds. (*Id.*)  Based upon Dr. Goldman's RFC analysis and plaintiff's own description of her prior work, the ALJ was justified in finding that plaintiff could perform her job as a laundry supervisor *as she performed it*.[25]

---

[25] Plaintiff's counsel submitted the description of "Launderer" positions in an attempt to argue that plaintiff could not perform the duties required. (T. 139-46).  The problem with these descriptions is that these are labeled "Tentative Classifications Standards," there is no effective date.  Although there is a date of August 25, 2010 at the bottom of the pages of the document, the document states that it is "subject to change" and "will be issued in final form at the completion of the review period." (T. 139).  These descriptions are dated long after the plaintiff's insured period expired, they are New York State Civil Service classifications, and there are no physical exertion requirements listed for each position.  In any event, as stated above, the ALJ could rely upon the plaintiff's job as it is performed in the national economy or as she performed it.  Thus, even if the job generally required a

At the first hearing, the ALJ did ask plaintiff about her former work. (T. 659). She stated that when she worked for the laundry, she had the option of being "up or down," and that if she had "a day where [she] was a little sore, I could be sitting down, but I also could, you know, stood [sic]." (T. 659). The fact that the ALJ did not ask plaintiff about every other aspect of her former work would not change the result particularly because it is clear that plaintiff understood that she could indicate on the disability form that she performed functions for less than one hour.

Plaintiff's counsel argues that because plaintiff worked in a correctional facility, it was a more stressful work environment. First, is no indication in the record that her former work was "stressful," and there is no indication that plaintiff was limited by any stress prior to March 31, 2005. While the court understands that plaintiff's condition may have gotten worse, the only issue before the ALJ and this court is plaintiff's condition prior to the expiration of her insured status. If plaintiff's condition became worse, she would be able to reapply for SSI benefits, assuming that she now meets the financial requirements.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the Commissioner's decision be **AFFIRMED**, and the plaintiff's complaint **DISMISSED.**

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have **FOURTEEN (14) DAYS** within which to file written objections to the foregoing

---

function that plaintiff could not perform, if her specific job did not require that function, she may still go back to that job.

report.  Any objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: August 31, 2012

**Hon. Andrew T. Baxter**
**U.S. Magistrate Judge**

32